## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| LINDA GAIL WINSTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:16-CV-419-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated May 3, 2016, this case has been transferred for the conduct of all further proceedings and the entry of judgment.  (doc. 20.)  Before the Court is *Plaintiff's Brief*, filed September 29, 2016 (doc. 31); *Defendant's Response Brief*, filed November 23, 2016 (doc. 35); and *Plaintiff's Reply (Corrected)*, filed December 30, 2016 (doc. 39).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND

### A.    Procedural History

Linda Gail Winston (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[1] denying her claim for disability and disability insurance benefits (DIB) under Title II of the Social Security Act.  On November 16, 2012, she applied for disability and DIB, alleging disability and DIB beginning on May 29, 2008.  (R. at 176-77.)  Her claim was denied initially on April 11, 2013, and upon reconsideration on June 24, 2013.  (R. at 115-18, 122-

---

[1] At the time of the initial filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

24.)  On July 23, 2013, she requested hearing before an administrative law judge (ALJ).  (R. at 126.)

She appeared and testified at a hearing on May 5, 2014, and amended her alleged onset date from

May 29, 2008 to February 22, 2012.  (R. at 29-58, 197.)  The ALJ denied Plaintiff's application on

September 22, 2014, finding her not disabled.  (R. at 10-25.)  Plaintiff timely appealed the ALJ's

decision to the Appeals Council.  (R. at 6-9.)  The Appeals Council denied her request for review,

and the ALJ's decision became the final decision of the Commissioner.  (R. at 1-5.)  Plaintiff timely

appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

**B.**     <u>Factual History</u>

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born on July 23, 1965, and was 48 years old at the time of the hearing on May

5, 2014.  (R. at 33.)  She went through 12th grade in school, and previously worked as a residential

director and psychiatric aide. (R. at 46, 54.)

    **2.**     **Medical Evidence**

On September 28, 2008, Plaintiff was admitted to the emergency room at Parkland Health

& Hospital System (Parkland) with a chief complaint of dizziness, nausea, and vomiting.  (R. at 304,

306.)   She was found to have multiple common bile duct stones and diagnosed with

choledocholithiasis.  (R. at 307.)  She underwent a laparoscopic cholecystectomy, and multiple

stones were removed.  (R. at 307-08.)  The doctors also noted that Plaintiff's diabetes was

uncontrolled, and that her right little toe had previously been amputated.  (R. at 306, 308.)  Plaintiff

was discharged on October 11, 2008.  (R. at 309.)  She followed up with Parkland on October 30,

3008 and November 3, 2009.  (R. at 285-88.)  At the appointments, the doctors noted that Plaintiff

weighed 337 and 346 pounds, respectively.  (R. at 285, 287.)

2

On December 4, 2008, Plaintiff was taken by ambulance to Baylor University Medical Center (Baylor) and admitted with a chief complaint of weakness. (R. at 268, 277.) Her vital signs were normal, and she was diagnosed with hypoglycemia and discharged the same day. (R. at 275-76.)

On January 21, 2009, Claudia Castano, M.D., completed a Medical Release/Physician's Statement in which she diagnosed Plaintiff with diabetic neuropathy and diabetes. (R. at 580.) She opined that Plaintiff was unable to work or participate in activities to prepare for work at all, and that her disability was permanent. (R. at 580.)

On July 30, 2009, Plaintiff was admitted to Methodist Hospital of Dallas (Methodist) with a chief complaint of vomiting and abdominal pain. (R. at 445.) She was found to have acute cholecystitis as well as pyelonephritis and a urinary tract infection. (R. at 439.) She was started on antibiotics, stabilized, and discharged on August 5, 2009. (*Id.*) On September 1, 2009, Plaintiff returned to Parkland for a follow-up to her admission to Methodist. (R. at 331, 467.) She had no new complaints. (R. at 331.) On April 2, 2010, Plaintiff had an evaluation for a cholecystectomy at the Parkland surgery clinic at Parkland. (R. at 337, 474, 691.) After her vitals were checked, she was transferred to Parkland's emergency room with a hypertensive urgency with no signs of hypertensive emergency. (R. at 337, 339.) She denied any dizziness, headaches, blurry vision, confusion, or focal weakness. (R. at 337.) She was discharged that day. (R. at 339.)

Between April 5, 2010 and July 3, 2012, Plaintiff had ten appointments at Parkland for medical refills and related to her edema, diabetes, hypertension, hypoglycemia and nocturnal hypoglycemic episodes, constipation, and blurred vision. (*See* R. at 341, 348, 351, 357, 365, 368, 372, 381, 395, 479, 487, 490, 494, 501, 504, 509, 512, 520, 666, 669-71, 681, 683, 691, 693, 700.)

She also requested a disabled parking placard/license plate.  (R. at 368.)  She reported leg pain with "prolonged walking."  (R. at 352, 667.)  On September 27, 2011, Plaintiff weighed 378 pounds. (*Id.*)

On September 28, 2011, Plaintiff had a panretinal photocoagulation to address a proliferative diabetic retinopathy in her left eye.  (R. at 669.)  On July 13, 2012, she had a diagnostic laparoscopy and a laparoscopic converted to open cholecystectomy.  (R. at 404.)  She was discharged on July 16, 2012.  (R. at 407.)  Her weight at discharge was reportedly 400 pounds.  (*Id.*)  At a post-operative check up on July 24, 2012, the doctors noted that Plaintiff was doing well.  (R. at 427, 555, 653.)

On December 6, 2012, Plaintiff had a follow up with Parkland regarding her hypertension and complained that she had developed a mass under the incision site of her surgery.  (R. at 430.) She denied dizziness or headaches and requested the completion of a Functional Capacity Study to determine her disability.  (*Id.*)  Plaintiff's physical examination noted that she weighed 377 pounds. (R. at 431.)  She had four other appointments at Parkland from January 6, 2013 to June 17, 2013. (R. at 558, 566, 596, 599, 615, 654.)

On March 1, 2013, Plaintiff had a consultative examination with Kelly Davis, D.O.  (R. at 574-76.)  She reported that she had chronic pain from arthritis and gout and had pain "all over."  (R. at 574.)  Plaintiff also reported that she suffered from worsening pain when she walked or stood and that her right knee was the most bothersome.  (*Id.*)  It would lock up and cause her to fall.  (*Id.*) During her physical examination, Dr. Davis noted that Plaintiff weighed 333 pounds and observed that she moved slowly, had great difficulty standing, and used furniture and the wall for support. (R. at 575-76.)  She did not use any assistive devices to walk, however, and she appeared to walk slowly with a wide based gait.  (R. at 576.)

On April 8, 2013, relying in part on Dr. Davis's report, state agency medical consultant (SAMC) Andrea Fritz, M.D., completed a Physical Residual Functional Capacity Assessment.  (R. at 91, 93-94.)  Dr. Fritz found that Plaintiff's allegations were partially supported by the medical record, and that she could occasionally lift and/or carry 10 pounds, frequently lift/or carry less than 10 pounds, stand and/or walk for a total of two hours, and sit for about six hours in an eight-hour workday.  (R. at 93-94.)  She had no limitations for pushing and/or pulling.  (R. at 93.)  She could also occasionally climb ramps and stairs, balance, stoop, kneel, and crouch but never climb ladders, ropes, or scaffolds.  (*Id.*)  Plaintiff could not hold her arms up for long periods.  (R. at 94.)  Based on her assessment, Dr. Fritz opined that Plaintiff could perform work at a sedentary exertional level with few postural limitations.  (R. at 95-96.)  SAMC Kavitha Reddy, M.D., agreed with Dr. Fritz's opinion on June 20, 2013.  (R. at 106-08.)

At an appointment at Parkland on June 17, 2013, a physician's assistant noted that Plaintiff weighed 399 pounds; was positive for myalgia, joint pains, and falls; and "[w]alk[ed] without assistance."  (R. at 601-02.)  She reported that Plaintiff had fallen three times in two weeks and that she used a walking cane when necessary.  (R. at 615.)  Plaintiff was "applying for Disability and *requested* prescription[s] for [a] Walker with seat and [a] shower seat."  (*Id.*) (emphasis added).  They were prescribed for her.  (R. at 557-58.)  On June 20, 2013, a physical therapist showed Plaintiff how to do knee exercises.  (R. at 604.)  The physical therapist's functional reporting assessment of Plaintiff's mobility noted that she was walking and moving around.  (*Id.*)

On August 11, 2014, Plaintiff returned to Parkland with a complaint of left-sided numbness and weakness, and she was admitted for a stroke work up.  (R. at 794-95, 798, 802.)  The doctors noted that "[h]er exam [was] not completely consistent with her complaints, though she [did] have

some mild weakness in her left leg," CT showed right-sided lacunar infarcts but no acute hemorrhage, and she weighed 367 pounds.  (R. at 798, 802, 821.)  Plaintiff reported that she had fallen 10-11 times over the prior three years due to dizziness or numbness in her legs.  (R. at 814.)  On August 13, 2014, she reported that she felt better and that the numbness and leg weakness were essentially resolved.  (R. at 802.)  Plaintiff demonstrated a stable gait pattern, and the doctors recommended that she lose weight and do regular exercise at home.  (R. at 807, 810.)  She was discharged home.  (R. at 810, 836.)

On September 2, 2014, Plaintiff went to Parkland for a disabled parking placard/license plate.  (R. at 837.)  It was noted that Plaintiff had left knee pain when walking a long distance and that she used a walker when walking long distances and a cane for short distances.  (*Id.*)  She denied headaches or dizziness.  (*Id.*)

### 3.    Hearing Testimony

On May 5, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 29-58.)  Plaintiff was represented by an attorney.  (R. at 31.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 48 years old, 5' 6" tall, and weighed 375 pounds, but that her weight fluctuated and sometimes went down to 325 pounds.  (R. at 33-34.)  She lived in a house with her husband, had a driver's license, and was able to drive.  (R. at 45-47.)

Beginning in 1997 or 1998, Plaintiff worked in a nursing home for five years.  (R. at 36.)  She had a variety of jobs at the nursing home, including working in the dietary department, dishwashing, and cooking.  (*Id.*)  She then worked as a Caregiver at Edu Care Community Living (Edu Care)—working in the workshop with clients and teaching them basic living, ABCs, and how

6

to comb their hair.  (R. at 35.)  After four years, she then worked as the Residential Director at Edu Care, a supervisory position.  (*Id.*)  As the Residential Director, Plaintiff was responsible for taking a class to and from doctor's appointments, ordering medications, buying groceries and room supplies, passing out medication,  bathing and feeding clients, and cooking.  (R. at 34.)  She explained that she was on her feet approximately 90 percent of the day, required to drive, and had to lift clients who weighed between 100 and 225 pounds every two hours.  (R. at 35.)  Plaintiff worked as the Residential Director for approximately five years until May 25, 2008, the day she last worked.  (R. at 34-35.)

Plaintiff was unable to work because of the pain in her legs and feet, lower back pain, dizziness/lightheadedness, and eyesight issues.  (R. at 36-37.)  She experienced pain in her legs everyday, which she described as a "sharp, needle pain" in both of her legs and feet.  (R. at 37.)  She also described the pain in her arms and lower back as a sharp pain, as if someone was pulling the muscles.  (R. at 41-42.)  The pain in her arms also made it hard to lift her arms up.  (R. at 49.)

She could stand in one place for only 10 minutes before she had to sit down, walk for 15-20 minutes before she had to stop, and sit for 30 minutes at a time before she needed to stand up.  (R. at 38, 43.)  She could comfortably lift and carry only 10 pounds.  (R. at 52.)  She did not receive any injections or physical therapy for her feet or back.  (R. at 47.)  Plaintiff's other medications caused her to feel dizzy and drowsy on a daily basis and nauseous twice a week.  (R. at 44-45.)  She relied on her sister's assistance when she went up and down stairs, a walker when she walked long distances, and a cane at home.  (R. at 39.)  She purchased a cane because her right knee would locked up when she sat for too long.  (R. at 40.)  A doctor prescribed the walker.  (R. at 38.)

Plaintiff also complained of her eyesight.  (R. at 37.)  She previously had retina surgery and

wore glasses.  (R. at 47.)  With her glasses she could read books and the newspaper.  (R. at 44.)  She

did not use a computer because the light bothered her eyes, however.  (R. at 42.)  When asked how

she spent her time at home, Plaintiff responded that she basically did nothing.  (R. at 51.)

       *b.*    *VE's Testimony*

The VE testified that Plaintiff had past work as a residential director (195.227-010, light

work, semi-skilled, SVP: 6) and a psychiatric aide (355.377-014, medium work, semi-skilled, SVP:

4).  (R. at 46, 54.)   The VE noted that Plaintiff described her work as a residential director at a

medium exertional level, but that the positions was traditionally defined as light work.  (R. at 53.)

The ALJ asked the VE to consider a hypothetical person of the same age, education, and

work background as Plaintiff, who could perform work at a sedentary level, lift up to ten pounds

occasionally, stand and/or walk for approximately two hours combined out of an eight-hour day, and

sit for a total of six hours out of an eight-hour day.  (R. at 54.)  She could not climb ladders, ropes,

or scaffolds, but could occasionally climb ramps and stairs.  (*Id.*)  Additionally, the hypothetical

person could occasionally balance, stoop, crouch, kneel, or crawl, and she could have only

occasional exposure to unprotected heights and no exposure to hazardous moving machinery.  (*Id.*)

The ALJ asked if the hypothetical person could perform any work in the regional or national

economy.  (*Id.*)  The VE opined that the hypothetical person could be an order clerk, food and

beverage (209.567-014, sedentary, unskilled, SVP: 2) with 100,000 positions nationally and 7,000

in Texas; an election clerk (205.367-030, sedentary, unskilled, SVP: 2) with 22,000 positions

nationally and 3,000 in Texas; and a lens inserter (713.687-026, sedentary, unskilled, SVP: 2) with

20,000 positions nationally and 1,300 in Texas.  (R. at 54-55.)  In response to a question, the VE

testified that there would be a significant erosional factor of the sedentary, unskilled occupational

base if the hypothetical person had to sit or stand alternatively.  (R. at 55.)  Of the previously

identified positions, the hypothetical person could still work as an order clerk, food and beverage.

(*Id.*)  She could also be a dowel inspector (669.687-014, sedentary, unskilled, SVP: 2) with 65,000

positions nationally and 3,187 in Texas or a surveillance system monitor (379.367-010, sedentary,

unskilled, SVP: 2) with 125,000 positions nationally and 8,400 in Texas.  (*Id.*)  The use of a cane

or walker would not affect the first set of jobs, but they would eliminate the second group.  (R. at

55-56.)  It would also be difficult for the hypothetical person to maintain competitive employment

if she was not on task at least 90 percent of the time or if she missed more than two days per month.

(R. at 57.)  Her testimony was consistent with the Dictionary of Occupational Titles (DOT).  (R.

at 56.)

## C.    The ALJ's Findings

The ALJ issued her decision denying benefits on September 22, 2014. (R. at 13-21.)  At step

one,[2] she found that Plaintiff had not engaged in substantial gainful activity from her amended onset

date of February 22, 2012, through her date last insured of December 31, 2013.  (R. at 15.)  At step

two, she found that Plaintiff had the severe impairments of diabetes mellitus with neuropathy,

history of amputated right fifth toe, history of cataracts, diabetic retinopathy requiring laser

surgeries, hypertension, history of chronic kidney disease, right adrenal mass, mild degenerative

joint disease of the knee, and morbid obesity.  (*Id.*)  Despite the impairments, at step three, she found

that Plaintiff had no impairment or combination of impairments that met or equaled the severity of

one of the impairments listed in the social security regulations.  (R. at 15-16.)

Next, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined

---

[2]  The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described below.

in 20 C.F.R. § 404.1567(a) except that she could lift up to 10 pounds occasionally, stand or walk for two hours in an eight-hour day, and sit for six hours in an eight-hour day. (R. at 16.) She could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; and occasionally balance, stoop, kneel, crouch, or crawl. (*Id.*) Plaintiff could also occasionally lift overhead but could have no exposure to unprotected heights, hazards, or moving machinery. (*Id.*)

At step four, the ALJ found that Plaintiff could not perform her past relevant work. (R. at 20.) The ALJ continued to step five and found that transferability of job skills was not material to the determination of disability because use of the Medical-Vocational Rules as a framework supported a finding that she was not disabled, whether or not she had transferrable job skills. (*Id.*) Considering her age, education, work experience, and RFC, the ALJ found there were jobs in significant numbers in the national economy that she could perform. (R. at 21.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined under the Social Security Act, from her amended onset date of February 22, 2012 through December 31, 2013, the date of last insured. (*Id.*)

## II. LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence

standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *Id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436 & n.1.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

11

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. ISSUES

Plaintiff raises the following issues for review:

1.

The ALJ found that Ms. Winston "weighs 333 pounds." The Decision does not mention that this is the lowest weight recorded during the relevant period. All others are 40 to 66 pounds higher. Given the important role that her obesity plays in aggravating her other ailments, does the ALJ's singular reliance on this "outlier" value warrant remand?

2.

(a) Plaintiff falls down frequently. She has injured herself in falls. She is sometimes unable to get up without help. Each time, her body hits the ground with the force of about 375 pounds. Did the ALJ reversibly err by failing to notice that she has fallen?

(b) It is the agency's burden to prove through VE testimony that Ms. Winston can do significantly available other work. In posing her key hypothetical questions, did the ALJ reversibly err by failing to apprise the VE of <u>any</u> of the following undisputed facts: that Ms. Winston (i) falls frequently, (ii) is extremely obese, (iii) has injured herself in falls, (iv) is sometimes unable to get up without help, (v) has "great difficulty standing" and needs to use the furniture or the walls to remain upright, or (vi) after sitting for a few minutes, she can no longer move her right lower extremity without help?

3.

(a) At the Commissioner's insistence, agency contract physician, Dr. Kelley Davis, gave Ms. Winston a physical exam. It led her to write a 3-page medical opinion, which includes numerous specific conclusions supportive of Ms. Winston's claim. Did the ALJ violate the medical-opinion regulation by failing to weigh Dr. Davis's opinion?

(b) The Decision selectively incorporates a handful of Dr. Davis's conclusions to support its skeptical view of the claim, but fails to evaluate many of her other conclusions that show Winston to be far more impaired than the ALJ found. Does the ALJ's failure to make clear whether she embraced those of Dr. Davis's conclusions favorable to Winston, or rejected them (and, if so, on what basis), preclude meaningful judicial review? Does the ALJ's selective use of only those parts of Dr.

13

Davis's report that could be seen to undermine her claim violate the rule against "picking and choosing," thereby depriving the Decision of "substantial evidence" support?

4.

The VE testimony and SSR 83-12 indicate that, if Ms. Winston needs the freedom to change positions between sitting and standing, then she is probably disabled. The ALJ's RFC finding does not permit her to change positions. It says nothing more about her limitations in sitting, standing, and walking than that she can sit for a "total" of 6 hours per day, and stand/walk for a "total" of two hours per day. We assume for purposes of this argument only that those totals are in fact correct.

(a) In finding that Ms. Winston <u>never</u> needs to (i) change positions between sitting and standing during the day, (ii) use the furniture, walls, a walker, a cane, or the assistance of a nearby coworker to stand, (iii) have assistance to move her leg after sitting -- did the ALJ violate the rule of *Ripley v. Chater*?

(b) Did the ALJ fairly interpret the particular medical records she marshaled to support her skeptical view of Plaintiff's need for the above-mentioned work accommodations?

5.

The ALJ found that Ms. Winston's "diabetic retinopathy requiring laser surgeries" and "history of cataracts" are "severe impairments" at step two. But the ALJ's residual functional capacity (RFC) finding assesses no visual limitations at all. Is this a facial inconsistency that warrants remand under the "fundamental" rules in *SEC v. Chenery*?

(doc. 31 at 6-7) (emphasis in original).

A.     <u>RFC</u>[3]

Plaintiff contends that the ALJ's RFC assessment was not supported by substantial evidence.

(doc. 31 at 15, 17, 27.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

---

[3] Plaintiff's issues one, two, three, and four all implicate the ALJ's RFC assessment, so they will be considered together. (*See* doc. 31 at 15, 17, 27.)  Additionally, Plaintiff's argument in her second issue regarding the ALJ's hypothetical also implicates step five.  (*Id.* at 20.)  Accordingly, that part of issue two will be considered separately from her RFC argument in issue two and considered last.

recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). The relevant policy interpretation states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.

SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

15

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted). Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

### 1.     *Lay Opinion*

Plaintiff argues that the ALJ improperly relied on her own lay opinion to determine the effects of Plaintiff's impairments in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995). (doc. 31 at 27.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *Ripley*, 67 F.3d at 552. The Fifth Circuit noted that although an ALJ

16

should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work. *Id.* The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27.

After making a credibility analysis, the ALJ considered all of the medical evidence and opinions in the medical record, including the opinions of Drs. Castano, Fritz, Reddy, and Davis.[4] (*See* R. at 16-19.) She concluded, "[o]verall, the claimant's treatment notes, physical examinations, diagnostic testing, consultative report, subjective complaints, and her activities of daily living suggest that her physical impairments are not as severe as she alleged." (R. at 17.) The ALJ appeared to give little weight to Plaintiff's subjective complaints—finding her allegations of pain not credible in light of the medical evidence. (R. at 19.) She then discussed the doctors' opinions. (*See* R. at 18-19.)

In considering the doctors' medical opinions, the ALJ noted that she gave the opinions of

---

[4] Although the ALJ did not refer to Dr. Davis by name, she repeatedly referred to her consultative examination and cited to her report throughout the RFC assessment. (*See* R. at 17-19.)

SAMCs Drs. Fritz and Reddy limited weight because they were only "somewhat consistent with the treatment notes, consultative examinations, physical exams, diagnostic testing, subjective complaints, and her activities of daily living." (R. at 18.) She noted the inconsistency of Dr. Castano's Medical Release/Physician's Statement, dated January 21, 2009—which was made several years before her amended alleged onset date of February 22, 2012, and merely opined that Plaintiff was unable to work because of a permanent disability—with the overall medical record.[5] (*See* R. at 13, 18, 580.) She then favorably cited to Dr. Davis's report several times. (*See* R. at 16-19.)

The ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she could lift up to 10 pounds occasionally, stand or walk for two hours in an eight-hour day, and sit for six hours in an eight-hour day. (R. at 16.) She could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; and occasionally balance, stoop, kneel, crouch, or crawl. (*Id.*) Plaintiff could also occasionally lift overhead but could have no exposure to unprotected heights, hazards, or moving machinery. (*Id.*) In making this assessment the ALJ appears to have relied primarily on the assessments of Drs. Fritz and Reddy, which were consistent with the RFC assessment. (*See.* R. at 16-19.) Because the RFC was based on specific medical opinions, the ALJ did not rely on her own lay opinion in violation of *Ripley*.

### 2.    *Consideration of Evidence*

Plaintiff next argues that the ALJ failed to consider her obesity and risk of falling in making

---

[5] Plaintiff correctly noted that the ALJ attributed the statement to Edith Hawkins-Frost, PAC, instead of Dr. Castano. (doc. 31 at 31.) Since the ALJ gave the medical opinion "limited weight because it [was] inconsistent with the overall medical evidence of record and the issue of disability is a matter reserved for the Commissioner," this error was harmless. *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (per curiam) (noting that "[a]mong the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work'") (citing 20 C.F.R. § 404.1527(e)(1)).

her RFC assessment.  (doc. 31 at 15, 17.)

As noted, a reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.  In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Id.* (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993)).  Likewise, the substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision.  *Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986).  An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence.  *Armstrong*, 814 F. Supp. at 1373.

There is no *general duty* of explanation or to provide rational and logical reasons for a decision, however.  *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases); *Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *21 (N.D. Tex. Mar. 22, 2017) (citing *Escalante*, 2015 WL 1443000, at *14).  The regulations require only that an ALJ consider and evaluate medical opinions.  *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record.  *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

### a. Obesity

Plaintiff argues that the ALJ significantly underestimated her obesity and engaged in "cherry picking" of facts. (doc. 31 at 15-17.) She points to the ALJ's reliance on her lowest recorded weight, which she contends "was almost certainly a measurement error." (*Id.* at 15-16.)

Although Plaintiff may disagree with the ALJ's decision, the ALJ clearly considered the medical evidence in the record, which included various weights from 2008 onward, and noted that her weight had fluctuated over time. (*See* R. at 13-21.) Additionally, in discussing Plaintiff's weight, the ALJ also explicitly cited to her own hearing testimony that she weighed 375 pounds but that her weight fluctuated and sometimes went down to 325 pounds.[6] (R. at 17-18.) Because the ALJ relied on medical evidence in the record and Plaintiff's own testimony in making her RFC determination, her assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).

### b. Risk of Falling

Plaintiff next argues that the ALJ's failure to consider her risk of falling in the RFC assessment warrants remand. (doc. 31 at 17.) She also claims that the decision "does not reviewably evaluate her risk of falling despite the fact that both a 'rolling walker with seat' and a

---

[6] During the hearing on May 5, 2014, Plaintiff testified as follows:

| | |
|---|---|
| Q | And about how much do you weigh? |
| A | About 375. |
| Q | Now for the past five years or so is that your normal weight? |
| A | Yes, it fluctuates up and down. |
| Q | Okay. About how much does it fluctuate? |
| A | Sometime it go down to about 325. |

(R. at 34.)

'shower seat' have been medically prescribed." (*Id.* at 19.)

Although Plaintiff contends that the ALJ did not take into account her risk of falling and use of assistive devices, the RFC assessment expressly considered both. (R. at 19.) For example, the ALJ considered Plaintiff's activities, that she appeared at the hearing with no cane or walker and appeared to ambulate well, that she appeared at the consultative examination without an assistive device, that she testified that she only used the walker when she had to walk a long distance outside of the home, and that her musculoskeletal examinations were mostly normal in January and July 2013. (R. at 18-19.) The ALJ also explicitly considered Plaintiff's dizziness and headaches in the decision, which she contends put her at a higher risk of falling. (R. at 19; doc. 31 at 18.) Medical records from Parkland, which were considered by the ALJ, also contain comments to doctors from Plaintiff regarding how often she fell and clarified that she *requested* the prescription for her walker. (*See* R. at 615) (noting that Plaintiff was "applying for Disability and *requested* prescription[s] for [a] Walker with seat and [a] shower seat") (emphasis added); (*see also* R. at 814) (noting that Plaintiff reported that she fell 10-11 times over the prior three years due to dizziness or numbness in her legs). Because the ALJ relied on medical evidence in the record  in making her RFC determination, her assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).

### 3.    *Dr. Davis's Medical Opinions*

Plaintiff next argues that the ALJ failed to weigh the medical opinions of Dr. Davis in making her RFC assessment. (doc. 31 at 20-21.)

The Commissioner is entrusted to make determinations regarding disability, including

weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b), 404.1527(c) (2012).  Every medical

opinion is evaluated regardless of its source.  20 C.F.R. § 404.1527(c)(1) (2012).  Generally, an

opinion from an examining source is given more weight than the opinion from a non-examining

source.  *Id.*  The "standard of deference to the examining physician is contingent upon the

physician's ordinarily greater familiarity with the claimant's injuries," however.  *Rodriguez v.

Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir.1994) (unpublished) (citing *Moore v.

Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  "[W]here the examining physician is not the

claimant's treating physician and where the physician examined the claimant only once, the level

of deference afforded [her] opinion may fall correspondingly."  *Id.*  The ALJ is also free to reject

the medical opinion of any physician when the evidence supports a contrary conclusion.  *Bradley

v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981).  Moreover, "[w]hen a treating or examining

physician's opinions are inconsistent with other substantial evidence in the record, the opinions are

not entitled to any specific weight in the ALJ's decision."  *Smith v. Comm'r of Soc. Sec. Admin.*, No.

4:12-CV-00625-DDB, 2014 WL 4467880, at *3 (E.D. Tex. Sept. 9, 2014); *Morvant v. Comm'r of

Soc. Security Admin.*, No. 12-CV-2716, 2014 WL 868912, at *9 (W.D. La. Feb. 28, 2014) (same).

Plaintiff argues that the ALJ failed to include "key conclusions" from Dr. Davis's

examination, including that Plaintiff "had great difficulty standing and used the furniture and wall

for support," "she moved with slow motions," "[s]he cannot demonstrate the ability to . . . heel/toe

walk," and "[s]he cannot attempt to demonstrate the ability to squat."  (doc. 31 at 21-24.)  She then

argues that the ALJ selectively relied on parts of Dr. Davis's report.  (*Id.* at 25.)  The Commissioner

responds that Dr. Davis performed only a physical examination of Plaintiff and did not opine

regarding what she could do despite those impairments, nor did she discuss any of Plaintiff's

22

physical or mental restrictions.  (doc. 35 at 4-5.)

Here, Dr. Davis saw Plaintiff only once and had no doctor-patient relationship with her, so her opinions were not entitled to controlling weight.  *See Rodriguez*, 1994 WL 449764, at *2 (noting where the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded her opinion may fall correspondingly).  Although the ALJ did not explicitly refer to Dr. Davis by name, she repeatedly referred to her consultative examination and cited to her report throughout the RFC assessment.  (*See* R. at 17-19.)  She also favorably included a number of specific references to Dr. Davis's observations and medical findings, including that Plaintiff weighed 333 pounds and had 5/5 strength in both lower extremities and upper extremities.  (*See* R. at 16-19.)  She explicitly considered the medical findings and incorporated them into her RFC assessment, implicitly giving her report at least some weight.  *See Hunt v. Astrue*, No. 4:12-CV-244-Y, 2013 WL 2392880, at *7 (N.D. Tex. June 3, 2013) ("The ALJ is not required to discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation."); *see also Walker v. Astrue*, No. 4:11-CV-680-A, 2011 WL 2989947, at *9 (N.D. Tex. June 1, 2011) ("[T]he ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record."), *adopted by* 2011 WL 2990691 (N.D. Tex. July 22, 2011).  Additionally, the SAMCs relied on Dr. Davis's examination report in making their assessments.  (*See* R. at 91, 94, 104, 107.)  Because the ALJ considered Dr. Davis's report, afforded her medical opinions some weight, and discussed the reasons for her decision in her narrative discussion, the ALJ did not commit legal error.

**B.**   **Reconciliation of Step Two and RFC Findings**

Plaintiff contends that remand is required because the ALJ erred in failing to reconcile her

step two and RFC findings.  (doc. 31 at 34.)

As noted, the RFC is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The purpose of assessing a claimant's RFC is to determine the work that can be done despite present limitations.  *See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam); 20 C.F.R. § 404.1545(a).  Federal courts in Texas have found that when impairments are identified as severe at step two but an RFC does not include any limitations for those impairments, the RFC in effect contradicts the step two finding.  *See Walker v. Colvin*, No. 3:14-CV-1498-L, 2015 WL 5836263, at *15 (N.D. Tex. Sept. 30, 2015) (citing cases); *Spears v. Barnhart*, 284 F. Supp. 2d 477, 483 (S.D. Tex. 2002) (noting that by failing to include any limitations, the ALJ "basically contradict[ed] the fact that he found [the claimant's] impairments to be severe"); *Norman v. Astrue*, No. SA-10-CA-849-XR, 2011 WL 2884894, at *6 (W.D. Tex. July 18, 2011) ("Similar to *Spears*, here the ALJ did not include any limitations resulting from the [impairment], contradicting his own finding that the [impairment] was 'severe.'"); *cf. Rangel v. Astrue*, No. H-08-2246, 2009 WL 2971129, at *15 & n.11 (S.D. Tex. Sept. 14, 2009) (contrasting the facts with *Spears*, the district court noted that the ALJ found the claimant's depression to be severe and assessed the appropriate mental limitations in his RFC determination for any residual effects of his depression).  This inconsistency generally

warrants remand.  *See, e.g., Spears*, 284 F. Supp. 2d at 483-84 (finding the ALJ's failure to address the claimant's limitations related to her severe impairment was error that warranted remand); *Norman*, 2011 WL 2884894, at *6 (finding remand was warranted where the ALJ found the claimant's limitation was severe at step two, but failed to include any limitation resulting from the impairment in his RFC analysis); *Martinez v. Astrue*, No. 2:10-CV-0102, 2011 WL 4128837, at *7 (N.D. Tex. Sept. 15, 2011) (same), *adopted by* 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011).

For example, in *Martinez v. Astrue*, an ALJ failed to include limitations resulting from a plaintiff's hand surgery in the RFC despite finding that the hand surgery was a severe impairment. *Martinez*, 2011 WL 4128837, at *5-6.  After noting that the ALJ may have made a mistake at step two or made a credibility determination regarding the claimant's limitations in deciding the RFC, the court explained that "on appellate review, [a court] cannot speculate as to what the ALJ may have considered." *Id.* at *7.  It remanded the case because it was unable to determine whether the ALJ intended the hand surgery to be a severe impairment, and if so, whether the RFC should have included certain limitations relating to it. *Id.* at *7 (noting "this Court cannot find that the ALJ's inclusion of the . . . severe impairment was merely meaningless verbiage").

Nevertheless, "having a severe impairment is not a sufficient condition for receiving benefits under the Secretary's regulations" and "means only that [the] claimant has passed the second step of the inquiry mandated by the regulations." *Shipley v. Sec. of Health & Human Servs.*, 812 F.2d 934, 935 (5th Cir. 1987) (per curiam).  In other words, the consideration of whether a claimant's impairments are severe at step two is a different inquiry than an ALJ's assessment of the claimant's RFC.  *See Gutierrez v. Barnhart*, No. 04-11025, 2005 WL 1994289, at *9 (5th Cir. Aug. 19, 2005) (per curiam) ("A claimant is not entitled to social security disability benefits merely upon a showing

25

that she has a severe disability. Rather, the disability must make it so the claimant cannot work to entitle the claimant to disability benefits."); *see also Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001) ("The ALJ's finding that [the claimant] had a 'combination of impairments that [were] severe' did not foreclose a finding that [the claimant] had a residual functional capacity to perform a range of light work, and is not necessarily inconsistent with that finding."); *Quigley v. Astrue*, No. 4:09-CV-402-A, 2010 WL 5557500, at *8 (N.D. Tex. Sept. 8, 2010) (noting that step two and the RFC determination are different inquiries), *adopted by* 2011 WL 61630 (N.D. Tex. Jan 5, 2011).

In cases where reviewing courts have found that an ALJ did not err in finding severe impairments at step two and not attributing any limitation to those impairments in the RFC assessment, the ALJs considered the limitations that were encompassed by the severe impairments or accounted for the limitations in some respect before making a disability finding. *See, e.g., Gonzalez v. Colvin*, No. 4:12-CV-641-A, 2014 WL 61171, at *6-7 (N.D. Tex. Jan. 6, 2014) (finding the ALJ's decision was not subject to reversal where he did not set forth specific limitations in his RFC determination relating only to the claimant's severe impairment but found other limitations that took into account the claimant's severe impairment); *Carnley v. Colvin*, No. 3:12-CV-3535-N, 2013 WL 5300674, at *9 (N.D. Tex. Sept. 20, 2013) (finding although the ALJ erred by finding claimant's seizure disorder to be a severe impairment and failing to incorporate limitations from the disorder into the RFC, it was clear he intended to include seizure limitations because the hypothetical questions posed to the VE at the hearing included such limitations, so there was no need to remand the case); *Scott v. Colvin*, No. 4:12-CV-01569, 2013 WL 6047555, at *11 (S.D. Tex. Nov. 14, 2013) (finding that the ALJ "fully addressed the impact of [the claimant's severe impairment] on her ability to do sustained work activities").

Plaintiff argues that the ALJ erred in failing to assess any visual limitation in her RFC, despite finding that Plaintiff had a history of cataracts and diabetic retinopathy requiring laser surgeries as severe impairments at step two. (doc. 31 at 34.) Finding these impairments were severe at step two, however, does not mandate additional limitations in the RFC. *Shipley*, 812 F.2d at 935 ("Satisfying the *Stone* test of severity means only that claimant has passed the second step of the inquiry mandated by the regulations."). The ALJ must clearly consider the severe impairments in determining the claimant's RFC, not necessarily assess limitations for each severe impairment. *See, e.g., Campbell v. Berryhill*, No. 3:15-CV-3913-N, 2017 WL 1102797, at *12 (Feb. 24, 2017) (finding error where "the ALJ expressly found that Plaintiff's deep vein thrombosis was one of twelve severe impairment at step two, but he did not *expressly address* what impact, *if any*, it had in determining Plaintiff's RFC") (emphasis added), *adopted by* 2017 WL 1091651 (N.D. Tex. Mar. 23, 2017).

Here, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus with neuropathy, history of amputated right fifth toe, history of cataracts, diabetic retinopathy requiring laser surgeries, hypertension, history of chronic kidney disease, right adrenal mass, mild degenerative joint disease of the knee, and morbid obesity. (R. at 15.) Despite these impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 15-16.) Next, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she could lift up to 10 pounds occasionally, stand or walk for two hours in an eight-hour day, and sit for six hours in an eight-hour day. (R. at 16.) She could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; and occasionally balance,

27

stoop, kneel, crouch, or crawl.  (*Id.*)  Plaintiff could also occasionally lift overhead but could have no exposure to unprotected heights, hazards, or moving machinery.  (*Id.*)

By explicitly considering the impact of her diabetes mellitus with neuropathy and her retinopathy with laser on her vision, the ALJ provided a sufficient explanation showing that she considered the severe impairments in making the RFC assessment.  (*See* R. at 16-19); *cf. Martinez*, 2011 WL 4128837, at *5-6 ("Without *some explanation* in the record as to how plaintiff can suffer from a severe impairment, which by definition must have more than a minimal effect on plaintiff's ability to work and why such severe impairment would not have had any limitation on plaintiff's ability to . . . [fulfill the necessary functions of] the jobs identified by the vocational expert, the decision cannot stand.") (emphasis added).  Accordingly, the ALJ considered the medical impairments from step two when she made her RFC determination and assessed Plaintiff's limitations based on their impact on her actual ability to do work.  There is therefore no inconsistency between the ALJ's step two findings and her RFC determination.[7]

## C.   Significant Number of Jobs

Plaintiff also generally contends that substantial evidence does not support the ALJ's step five finding that she retains the ability to perform other jobs in significant numbers in the national economy.  (doc. 31 at 20.)

To be considered disabled, a claimant must have a severe impairment that makes her unable to perform her previous work or any other substantial gainful activity existing in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a).  According to the Code of Federal

---

[7]  Although Plaintiff cites to *S.E.C. v. Chenery Corp.*, 332 U.S. 194 (1947) to support the position that where the written decision is ambiguous or internally inconsistent, the proper course is to remand so that the fact-finder's intent can be clarified rather than be speculatively reviewed, (doc. 31 at 34), the ALJ's decision is neither ambiguous nor internally inconsistent on this issue.

Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

To establish that work exists for a claimant at step five of the sequential disability determination process, the ALJ relies on the testimony of a VE in response to a hypothetical question[8] or other similar evidence, or on the Medical–Vocational Guidelines promulgated to guide this determination, often referred to as "the Grids."[9] *Newton*, 209 F.3d at 458; *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curium); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling*, 36 F.3d at 436; *see also Hernandez v. Astrue*, 269 F. App'x 511, 515 (5th Cir. 2008) (citing *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002)).

A claimant's failure to point out deficiencies in a hypothetical question does not, however,

---

[8] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, No. 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).

[9] The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

"automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).  The ALJ's failure to reasonably incorporate a claimant's disability into his or her hypothetical questions may render those questions defective if the disability severely limits the claimant's job prospects.  *See Bridges v. Comm'r of Soc. Sec. Admin.*, 278 F. Supp. 2d 797, 806-07 (N.D. Tex. 2003).  If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of proof to show that a claimant could perform available work despite an impairment.  *Boyd*, 239 F.3d at 708.

Here, the Plaintiff argues that the ALJ's hypothetical question to the VE failed to apprise her of Plaintiff's (1) extreme obesity and (2) her significant risk of falling.  (doc. 31 at 20.)  She relies solely on her disagreement with the RFC assessment and her argument that the RFC was not supported by substantial evidence.  (*See id.*)  The ALJ's RFC finding is supported by substantial evidence, however, so the ALJ's hypothetical was not deficient by failing to include her obesity and risk of falling.  Accordingly, the ALJ did not err in basing her decision at step five on the VE's response to her hypothetical.

### IV.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 31st day of March, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE